UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

RICHARD W LEVIER                           CASE NO.  2:19-CV-01602

VERSUS                                     JUDGE TERRY A. DOUGHTY

CB&I LLC ET AL                             MAGISTRATE JUDGE KAY

<u>MEMORANDUM ORDER</u>

Before the Court is a Motion for Summary Judgment filed by Defendants CB&I LLC

("CB&I") and McDermott International Inc. which asks the Court to dismiss all claims asserted

by Plaintiff.  Rec. Doc. 36.  Plaintiff, Richard Levier ("Mr. Levier") opposes this Motion.  Rec.

Doc. 46.  For the following reasons, this Motion is **DENIED**.

I.      Factual Background

        This case stems from alleged racial harassment, discrimination, and retaliation

experienced by Mr. Levier while working with CB&I.  Rec. Doc. 1.  Mr. Levier began working

with CB&I in August of 2017.  Rec. Doc. 36-2, ¶1.  During the early months of his employment

with CB&I, Mr. Levier alleges that he was subjected to racially discriminatory behavior on

numerous occasions.  *See* Rec. Doc. 1, ¶¶13-18.  This allegedly included the repeated use of the

n word by one co-worker, Billy Austin ("Mr. Austin"), on at least a weekly basis from November

through December of 2017.  Rec. Doc. 46-1, Ex. A, p. 145-47.  Mr. Levier further claimed that

another co-worker, Allison Cauthen ("Ms. Cauthen"), would regularly say the phrase "equal

rights for southern whites" to Mr. Levier, even after he asked her to stop.  *Id.*, p. 147-48.  Finally,

Mr. Levier alleges that two co-workers, Ms. Cauthen and Tommy Wiltcher ("Mr. Wiltcher"),

wore Confederate flag stickers on their company hard hats which they refused to remove at Mr.

Levier's personal request.  *Id.*, p. 154-56.  Mr. Levier claims that his immediate supervisor, Greg Parker ("Mr. Parker"), was aware of this behavior, both through his personal observations in addition to being informed by Mr. Levier.  *See Id.*, p. 140-158 (including testimony by Mr. Levier that Mr. Parker knew about each of these instances of harassment).  CB&I does not rebut Mr. Levier's allegations that this conduct occurred, although CB&I does deny that Mr. Parker knew about any of this conduct.  *See* Rec. Doc. 41-6, Ex. E, p. 29-30, 89.

Ultimately, in December of 2017, Mr. Levier went to Rhonda Glover ("Ms. Glover") in CB&I's Human Resources department and reported the conduct of his co-workers.  Rec. Doc. 41-5, Ex. D, ¶¶5-6.  This led to an investigation which culminated in the termination of Mr. Austin and Ms. Cauthen.  Rec. Doc. 49-16, Ex. J at 4.  In addition, both Mr. Wiltcher and Mr. Parker were both required to receive counseling on CB&I's policies regarding "Workplace Harassment, Discrimination, and Retaliation," and Mr. Parker was also given a written reprimand for his failure to "manag[e] the work environment properly and professionally."  *Id.* at 4-5.

In the following months, additional problems arose between Mr. Levier and CB&I, ultimately culminating in Mr. Levier's termination in March of 2018.  The first issue regarded Mr. Levier's use of a cell phone while at work.  Per company policy, this would have led to Mr. Levier's termination.  Rec. Doc. 49-17, Ex. K at 5.  However, when CB&I reviewed the incident, they determined that there was some confusion about the policy and Mr. Levier's reprimand was voided.  *Id.*  The next issue involved allegations of sexual harassment by a co-worker named Amanda Morris against Mr. Levier.  *Id.* at 6-7.  Finally, in March of 2018, Mr. Levier came to HR again to complain about several co-workers who were using knives in the workplace against company policy.  *Id.* at 11.  As this issue was investigated, CB&I was informed by Mr. Levier's

2

co-workers that Mr. Levier had repeatedly told a story about beating a man in a way that made them feel threatened. *Id.* at 12-13, *see also* Rec. Doc. 41-5, Ex. D (containing multiple employee statements alleging that Mr. Levier talked about severely beating a man). As a result, Mr. Levier was terminated for violating CB&I's policy on violence in the workplace. Rec. Doc. 49-17, Ex. K at 16; Rec. Doc. 41-4, p. 144 (stating that Mr. Levier was terminated for potential workplace violence). While CB&I contends that their decision to fire Mr. Levier was based on their workplace policies, Mr. Levier argues that the decision was both based in continued racial animus against him as well as in retaliation for his December report regarding racial harassment from his co-workers. To support this argument, Mr. Levier alleges that other co-workers told similar stories as part of regular discussions about guns but that he was the only one punished for this behavior. *See* Rec. Doc. 46-2, Ex. A, p. 258, 289.

II.     Legal Standard

Summary judgment is appropriate where one party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The key question in this analysis is whether the evidence on record "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of proving that there are no genuine issues of material fact to be resolved at trial. *Bustos v. Martini Club Inc.*, 599 F.3d 456, 468 (5th Cir. 2010). If the moving party meets this initial threshold, then "the burden shifts to the nonmoving party to produce evidence that a genuine issue of material fact exists for trial." *Id.* During this analysis, courts must "view the facts in the light most favorable to…the nonmoving party." *City and Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 603

(2015).  Further, "all justifiable inferences are to be drawn" in favor of the nonmoving party.

*Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59

(1970)).

   III.   Analysis

       a. Hostile Work Environment Claim

   Courts consider "racial discrimination and retaliation claims based on Title VII and 42

U.S.C. §1981 under the same rubric of analysis."  *Johnson v. PRIDE Industries, Inc.*, 7 F.4th

392, 399 (5th Cir. 2021) (citing *Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019)).  To

assert a hostile work environment claim a plaintiff must demonstrate that he:

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment…was based on his membership in the protected group; (4) the harassment…affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Pride Industries*, 7 F.4th at 399 (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

In the present Motion, there are three disputed issues which the Court needs to resolve: 1)

whether the harassment was severe or pervasive enough to affect a term or condition of

employment, 2) whether the employer had notice prior to December of 2020, and 3) whether

they took prompt corrective action.  The Court will review each in turn.

           i. Did the Harassment Affect a Term or Condition of Employment

   "A hostile work environment exists when the 'workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive work environment."  *Pride

Industries*, 7 F.4th at 399 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). This

claim does not require evidence of "economic or tangible discrimination," but focuses on

whether the alleged harassment is "severe or pervasive enough" that "a reasonable person would find [the work environment] hostile or abusive." *Harris*, 510 U.S. at 21 (quotations and citations omitted).  In looking at whether the conduct is objectively hostile, Courts look "at all the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Not every use of a racial epithet creates a hostile workplace. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  However, repeated and consistent "discriminatory verbal intimidation, ridicule and insults may be sufficiently severe or pervasive" to sustain a hostile work environment claim. *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir. 1993) (citations omitted);  *see also Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1049 (5th Cir. 1996) ("We assume, *arguendo*, that if there were specific evidence of [routinely made racist remarks] in the record, such facts may have prevented summary judgment from being rendered against Wallace on this claim").

In this present matter, the parties do not dispute whether the conduct occurred, but rather dispute whether the conduct was severe enough to sustain a hostile work environment claim. The Court finds that a reasonable jury could, considering all the circumstances, readily determine that the conduct was severe and pervasive enough to create a hostile work environment.  First, from November 2017 to December 2017, Mr. Levier alleges that Mr. Austin said the n word at least once per week, if not more.  Rec. Doc. 41, Ex. A, p. 139-146.  Mr. Levier also indicated in his deposition that Ms. Cauthen would frequently recite the phrase "equal rights for southern whites," beginning in August when Mr. Levier joined CB&I.  Rec. Doc. 46-1, Ex. A, p. 147-150.

Notably, Mr. Levier also testified that Ms. Cauthen used the phrase even more frequently after he had spoken with her about the racial implications of the phrase. *Id.*, p. 152-153. Finally, Mr. Levier alleges that both Ms. Cauthen and Mr. Wiltcher had Confederate flag stickers on their helmets when he began working there. *Id.*, p. 154-157. When Mr. Levier asked these individuals to take off the stickers, Mr. Wiltcher told Mr. Levier "[a]in't nobody going to tell me to take this thing off my hat." *Id.*, p. 155-156. As to the Confederate flag stickers, CB&I seemingly determined that these stickers were inappropriate as Ms. Glover required the stickers to be removed after Mr. Levier had gone to HR. *See* Rec. Doc. 36-6, Ex. C, p. 74. When this information is viewed in totality, the Court finds that a jury could determine that the workplace was sufficiently hostile, thus making summary judgment inappropriate.

ii. Did the Employer have Notice of the Harassment Prior to 2020

CB&I next argues that the hostile work environment claim should be dismissed since they did not have knowledge of the harassment. At the outset, the Court notes that there is a clear factual dispute as to whether Parker, the foreman at the job site, knew about the alleged harassment. Parker in his deposition admitted that he recalled seeing the Confederate flags worn by Wiltcher and Cauthen. Rec. Doc. 46-4, Ex. B, p. 33. However, Parker denies remembering hearing either "equal rights for southern whites" or the n word. *Id.*, p. 32, 89. In contrast, Mr. Levier stated in his deposition that both phrases were repeatedly used in Mr. Parker's presence. *See* Rec. Doc. 46-1, Ex. A, p. 140-143, 151. Further, Mr. Levier stated that he informed Mr. Parker and another supervisor prior to his December 20, 2017, discussion with HR about the alleged harassment. *Id.*, p. 84-85, 143-145. Thus, there is a clear factual dispute as to what Mr. Parker knew about the situation, and resolution of that dispute would require credibility

determinations which are improper at the summary judgment stage.  Thus, the key question is whether Mr. Parker had enough of a supervisory role that his knowledge can be imputed to CB&I.

Employers "cannot be held liable for conduct of which [they] have no knowledge." *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 299 (5th Cir. 2001).  Consequently, employers are only liable for harassment if they "knew or should have known of the harassment in question and failed to take prompt remedial action."  *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998) (quoting *Jones v. Flagship Int'l*, 793 F.2d 714, 720 (5th Cir. 1986)).  Actual knowledge occurs when the harassment "is known to 'higher management' or to someone who has the power to take action to remedy the problem."  *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) (citation omitted).  Determining whether an individual is "higher management" requires an inquiry of whether that individual had any "remedial power" to resolve the issue.  *Id.* at 929-930.  Notably, this does not require the ability to make decisions to fire or promote someone, but merely requires the ability to "address the harassment problem." *Williamson*, 148 F.3d at 466.  Where an "employer has structured its organization such that a given individual has the authority to accept notice of a harassment problem, then notice to that individual is sufficient to hold the employer liable."  *Id.* at 467.

In the present case, it appears that Mr. Parker was "higher management" sufficient to put CB&I on notice of the alleged harassment.  First, their policy regarding harassment encourages someone experiencing harassment to "notify your <u>supervisor</u>, department manager, Human Resources partner, or contact the CB&I Ethics Line."  Rec. Doc. 49-21, Ex. O (emphasis added).  Further, Mr. Parker in his deposition stated that workers were supposed to bring these types of complaints to the supervisor first, rather than immediately going to HR.  Rec. Doc. 46-4, Ex. B,

p. 29-30.  Finally, after the matter was brought to HR, CB&I gave Mr. Parker a written
reprimand for "not managing the work environment properly and professionally."  Rec. Doc.
367, Ex. D, ¶10.  While Mr. Parker did not have the ability to fire any of the employees under
him, that is not the required standard for imputed knowledge.  Rather, the question is whether he
had some power to remedy the harassment, including whether he had the authority to accept
notice of a harassment problem.  At a minimum, there is a genuine issue of material fact as to
whether CB&I had imputed knowledge of the harassment, thus making summary judgment
inappropriate.

iii. Did CB&I take Prompt Remedial Action

Finally, CB&I argues that they took prompt remedial action which remedied the situation.
However, this argument focuses exclusively on whether the company promptly responded after
Mr. Levier went to the HR department on December 20, 2017.  *See* Rec. Doc. 36-1 at 8-9, Rec.
Doc. 51 at 3-4.  As shown above, however, there remains a factual dispute as to whether CB&I
knew of the harassment prior to that time through Mr. Parker.  Thus, for the Court to grant
summary judgment on this issue, CB&I would have had to show that the actions taken in
December constitute prompt remedial action as to the entire length of the alleged harassment,
which began in August of 2017.  As this issue was not raised, summary judgment on this issue
would be inappropriate.

Because genuine issues of material fact remain as to whether the alleged harassment was
severe and pervasive and whether CB&I had knowledge of that harassment prior to December
20, 2017, and because the issue regarding prompt remedial action as to CB&I's potential
knowledge prior to December 20, 2017, was not raised, summary judgment is **DENIED** as to
plaintiff's hostile work environment claim.

8

b. Title VII Racial Discrimination Claim

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).  Establishing a prima facie case of racial discrimination requires

> a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

*McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (citation omitted).  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the discharge."  *Singh v. Shoney's, Inc.*, 64 F.3d 217, 219 (5th Cir. 1995).  If the defendant meets this requirement, then the burden shifts back to the plaintiff to show "by a preponderance of the evidence, that the reason provided by the defendant was a pretext for discrimination."  *Id.* at 219 ((citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).  In this matter, there are two key disputed issues.  The first is whether in establishing his prima facie case, Plaintiff has established a genuine issue of fact as to whether he was treated less favorably than other similarly situated employees who were not African American.  The second issue is whether CB&I's stated reason for terminating Mr. Levier was pretextual or not.  The Court will examine each in turn.

i. Was Mr. Levier Treated Differently than other Similarly Situated
    Individuals

Key to establishing a prima facie case of discrimination is a showing that the plaintiff was "treated differently" than employees outside of the protected group "under circumstances 'nearly identical'" to the plaintiff's.  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).  In the context of a work-rule violation, such as the present case, a plaintiff can meet this requirement "by showing 'either that he did not violate the rule or that, if he did, [employees not belonging to the protected group] who engaged in similar acts were not punished similarly.'"  *Mayberry*, 55 F.3d at 1090 (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)).

Mr. Levier first seeks to meet the prima facie case by arguing that he did not violate the work-rule in question.  It appears from the record that Mr. Levier was fired for violating company policies regarding "workplace violence."  Rec. Doc. 46-5, Ex. C, p. 144.  However, Mr. Levier denies that he ever "threatened or implied" any threats.  Rec. Doc. 46-1, Ex. A, p. 104.  Rather, he contends that he merely took part in conversations about guns that were commonplace at the job site.  Rec. Doc. 46-2, Ex. A, p. 257-258.  Within the Fifth Circuit, district courts have disagreed upon whether a denial by the plaintiff of violating the work rule are sufficient to avoid summary judgment on the prima facie case.  *See Harkness v. Bauhaus U.S.A., Inc.*, 86 F.Supp.3d 544, 556-57 (N.D.Miss. Feb. 06, 2015) (highlighting split in circuit courts as to whether a denial is sufficient to create a prima facie case).  Since a prima facie case requires only "a very minimal showing," the Court finds that Mr. Levier's denial of violating CB&I's policy on workplace violence is  sufficient to establish a prima facie case of discrimination. *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).[1]

---

[1] The Court notes, however, that Mr. Levier also argues that he has established his prima facie case through evidence of disparate treatment.  This is discussed below in the discussion of pretext, but the Court would also find that this evidence is sufficient to establish Plaintiff's prima facie case.

ii. Was there Evidence of Pretext

In response to Mr. Levier's prima facie case, CB&I has provided a legitimate, nondiscriminatory reason for firing Mr. Levier – that his repeated discussions about "violence and beating a guy with a gun" were viewed as threatening by other co-workers who felt that he was creating "a hostile and intimidating environment for his co-workers."  Rec. Doc. 36-6, Ex. 6, p.

---

15.  By producing this reason, CB&I has shifted the burden back to Mr. Levier to produce evidence that this reason is pretextual.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (showing that the defendant's burden is merely one of production).  To establish pretext, the plaintiff must "put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates" either "by showing that a discriminatory motive more likely motivated her employer's decision, such as through disparate treatment, or that her employer's explanation is unworthy of credence."  *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 220 (5th Cir. 2001) (citations and quotations omitted).

Alternatively, on a discrimination claim, a plaintiff can also overcome summary judgment by showing that there were mixed motives and that the protected characteristic was one of the motivating factors.  *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011).  Thus, on a discrimination claim, a plaintiff need only show enough facts to create an issue as to whether the protected characteristic played some role in the company's decision.

Here, Mr. Levier argues both that the timing and nature of the investigation makes CB&I's explanation "unworthy of credence" and that he was treated differently than other individuals in similar situations.  The Court will look at each argument in turn.

11

As to the first argument, Mr. Levier points out several alleged inconsistencies in the explanation of how CB&I learned about the supposedly threatening conversations leading to his termination.  He then asserts a cat's paw theory arguing that the individuals who ultimately fired him based their decision on the testimony of other employees who may have had racial animus. It does appear that the decision to terminate Mr. Levier was based almost entirely on reports from his co-workers.  Rec. Doc. 46-5, Ex. C, p. 135-36.  Notably, at least three of these reports came from Mr. Wiltcher after Mr. Levier had complained about knives in the workplace.  Rec. Doc. 41-5, Ex. D.  In his interview with HR after Mr. Levier complained about the knives, Mr. Wiltcher became visibly distraught and noted that he was "so frustrated" due to his repeated interactions with HR "since November" as a result of Mr. Levier's repeated complaints.  Rec. Doc. 49-17, Ex. K at 12.[2]  It was at this moment that Mr. Wiltcher first informed CB&I of Mr. Levier's conversations about beating a man.  *Id.*

To establish a cat's paw theory, the plaintiff must show "(1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'"  *Roberson v. Alltel Information Services*, 373 F.3d 647, 653 (5th Cir. 2004) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)).  As noted above, Mr. Wiltcher and other co-workers who were frustrated with Mr. Levier had significant influence over the decision to fire Mr. Levier, as they provided the only evidence to fire Mr. Levier.  Given that Mr. Wiltcher had already been reprimanded regarding harassment in December of 2017 after Mr. Levier had complained to HR and given his influence

---

[2] The Court notes here that one of these visits to HR initiated by Mr. Levier would likely include the December 20, 2017, investigation which led to Mr. Wiltcher being reprimanded and required to remove the Confederate flag sticker.  Rec. Doc. 49-16, Ex. J, p.4.

in the decision to fire Mr. Levier, the Court finds that there is a genuine issue of fact as to whether the explained reason was pretextual under a cat's paw theory.

In addition, Mr. Levier provides evidence that other individuals were not punished despite discussing similar matters to Mr. Levier.  For example, Mr. Levier testifies that Mr. Wiltcher, who was not fired, participated in discussions about "guns, shooting, [and] hunting." Rec. Doc. 46-2, Ex. A, p. 258.  These discussions allegedly occurred "every day."  *Id.*  Mr. Levier testified that on one occasion, Mr. Parker allegedly told a story about shooting a man from his truck.  *Id.*  In addition to Mr. Levier's testimony, the record shows that on at least one

---

occasion another co-worker had informed CB&I that Mr. Parker and Mr. Wiltcher had "threatened to meet [Mr. Levier] after work" during a discussion with Mr. Levier that the coworker feared was going to "escalate [sic] to violence."  Rec. Doc. 49-14, Ex. H, p.1.

When a plaintiff seeks to demonstrate pretext by showing disparate treatment, they must show that the employee or employees to whom they are comparing themselves are "similarly situated."  *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).  "Employees with different supervisors, who work for different divisions of a company or who were subject to adverse employment actions too remote in time from that taken against the plaintiff will not be deemed similarly situated."  *Id.* (citations omitted).  However, while the comparator must be "nearly identical," they need not be completely "identical."  *Id.*, at 260 (5th Cir. 2009) (quotations omitted).  For example, the comparator can have a different supervisor so long as the ultimate decisionmaker as to employment is the same between the employees and the violations are of "comparable seriousness."  *Id.* at 260-61.

Mr. Levier was supposedly fired for repeatedly talking about a fight that he had been in to the extent that his co-workers felt threatened.  However, to establish pretext, Mr. Levier has put forth evidence showing that Mr. Wiltcher had also made similar comments and statements but was not terminated, including at least one time directly threatening Mr. Levier.  The Court finds that Mr. Wiltcher's conduct is sufficiently similar to Mr. Levier's conduct to establish pretext.

Ultimately, the Court finds that there is enough of a factual dispute regarding CB&I's stated reason for firing Mr. Levier that a reasonable jury could conclude that it was pretextual. As such, summary judgment is **DENIED** as to Mr. Levier's Title VII discrimination claim.

c. Title VII Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show "that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 557 (5th Cir. 2007) (citations omitted).  An adverse employment action is any action which is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  "Trivial harms" such as "petty slights or minor annoyances that often take place at work" cannot sustain a retaliation claim. *Id.* at 68.  As to the causal connection at the prima facie stage, temporal proximity alone can meet that burden if the timing is close enough. *Garcia v. Professional Contract Services, Inc.*, 928 F.3d 236, 241 (5th Cir. 2019).

It is unclear within the Fifth Circuit as to how much time can pass before temporal proximity alone can no longer establish the prima facie case of retaliation.  To begin with, the Supreme Court in 2001 held that "the temporal proximity must be very close" accompanied by a

citation, along with other cases, to a Tenth Circuit case, among other cases, which held that a three-month gap was insufficient. *Clark County School Dist. V. Breeden*, 532 U.S. 268, 274 (2001) (quotations omitted) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)). Several unpublished Fifth Circuit cases have used this citation as evidence that three months is too long to establish causation through temporal proximity alone. *See e.g.*, *Besser v. Texas General Land Office*, 834 F.App'x 876, 884 (5th Cir. 2020) ("The United States Supreme Court has favorably cited a decision holding that three months is not within the 'very close' requirement"). However, several published opinions which remain valid, have stated that "'a time lapse of up to four months' may be sufficiently close" to establish causation. *Feist v. Louisiana, Dep't of Justice, Office of the Atty. General*, 730 F.3d 450, 454 (5th Cir. 2013) (quoting *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001)). Thus, while there is some confusion, the most binding Fifth Circuit precedent seems to indicate that a three-month gap could, but would not automatically, establish a prima facie case of retaliation.

Mr. Levier was fired almost exactly three months after he reported his colleagues to HR for racial harassment.[3] Rec. Docs. 49-16, Ex. J (showing Mr. Levier's complaint on December 20, 2017); Rec. Doc. 49-17, Ex. K, p. 10 (showing Mr. Levier was terminated on March 22, 2018). Thus, there was clearly an adverse action that followed a protected activity. And since the most binding precedent seems to indicate that three months could be sufficiently close to establish a prima facie case, the Court finds that Mr. Levier has established a prima facie case of retaliation.

---

[3] Mr. Levier also seeks to assert the voided reprimand as well as the brandishing of knives as adverse actions. However, as to the voided reprimand, no action was actually taken against Mr. Levier. As to the issue with knives, CB&I was not threatening him, and the Court would not consider this an adverse employment action as a form of retaliation.

Because Mr. Levier has established his prima facie case, the *McDonnell* burden shifting analysis is employed again.  CB&I responds that they fired Mr. Levier for violating their workplace policy against violence in the workplace.  However, as discussed previously, the Court finds that Mr. Levier has shown enough facts to create a genuine issue of material fact as to whether CB&I's sole reason for firing Mr. Levier reasoning was pretextual.  As such, the Court **DENIES** summary judgment as to the retaliation claim because the Court finds that there is enough evidence that a jury could find that Mr. Levier was fired in retaliation for reporting harassment from his co-workers in December of 2017.

### IV.     Conclusion

At summary judgment, the Court must view all factual disputes and all reasonable inferences in favor of the non-moving party.  Under this standard, as discussed above, the Court finds that factual disputes exist which preclude summary judgment on all three of Mr. Levier's claims.  As such, the Motion for Summary Judgment (Rec. Doc. 36) is **HEREBY DENIED**.

**THUS DONE AND SIGNED** in Monroe, Louisiana on this 16th day of June, 2022.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE